FILED

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

2017 MAR -9  AM 9:36

3:17-cv-272-J-32JRK

ENVIRONMENT AMERICA, INC.,
d/b/a ENVIRONMENT FLORIDA,

    Plaintiff,

       v.

PILGRIM'S PRIDE CORPORATION,

    Defendant.

**INJUNCTIVE RELIEF SOUGHT**

## COMPLAINT

## INTRODUCTION

1.   This is a citizen enforcement suit brought by a non-profit environmental organization, on behalf of its members, against Pilgrim's Pride Corporation ("Pilgrim's") to redress and prevent ongoing federal Clean Water Act ("CWA" or "Act") violations that pollute and adversely affect the Suwannee River.  The Suwannee River has been designated by the State of Florida as a Special Waters Outstanding Florida Water, which means that the river has "exceptional recreational or ecological significance."

2.   Pilgrim's owns the Live Oak Florida Processing Plant in Live Oak, Florida.

3.   Chickens are slaughtered, bled, scalded, de-feathered, eviscerated, cut up, deboned, and packed at the Plant.

4.   Pilgrim's operates a hatchery at the Plant to produce chicks which are distributed to contract growers.

5.   Wastewater is generated at the Plant.  Pilgrim's discharges wastewater from the Plant into the Suwannee River.

6.   Pilgrim's has a National Pollutant Discharge Elimination System ("NPDES") permit that governs the discharge of the Plant's wastewater into the Suwannee.  The Plant's NPDES permit limits the amount of allowable pollutants in, and regulates other characteristics of, the Plant's wastewater.

7.   The Plant is required to have a NPDES permit by the federal Clean Water Act.  The Florida Department of Environmental Protection ("FDEP) issued the NPDES permit for the Plant.  FDEP was delegated the authority to issue NPDES permits by the United States Environmental Protection Agency ("EPA").

8.   Pilgrim's has violated the NPDES permit for the Plant.  A violation of a NPDES permit is a violation of the CWA.

9.   The Plant's wastewater has repeatedly violated the limit for chronic toxicity contained in the NPDES permit.  The Plant's wastewater also has repeatedly exceeded the limits for specific conductance, nitrogen, and carbonaceous biological oxygen demand contained in the NPDES permit.  Pilgrim's history of NPDES permit violations extends back before the applicable statute of limitations in this case, December 30, 2011, which is five years prior to service of the statutorily-required pre-suit notice.

10.  Pilgrim's will continue to violate its NPDES permit after the date this Complaint is filed.

11.  A February 3, 2017 memo from FDEP Wastewater Inspector Herndon Sims stated that there are "significant noncompliance issues" at the Plant, and that Pilgrim's "is still having issues with meeting the permit limits."

12.   Plaintiff's members consider the Suwannee River to be one of Florida's most important waterways.  They are concerned about the impacts of the pollutants discharged by Pilgrim's on the health and safety of the river and their local environment, and their use and enjoyment of the river is adversely affected by the CWA violations detailed herein.

13.   Plaintiff intends this action to encompass post-Complaint violations of the types alleged.

14.   Neither the federal government nor the state of Florida has taken enforcement or other regulatory action sufficient to prevent Pilgrim's from violating the Act.

## THE CITIZEN SUIT PROVISION OF THE CLEAN WATER ACT

15.   The objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA prohibits the discharge of any pollutant from a point source into navigable waters except as authorized by a NPDES permit applicable to that point source.  33 U.S.C. §§ 1311(a) and 1342.

16.   The CWA authorizes citizens to commence an enforcement action against any person who is in violation of "an effluent standard or limitation" of the CWA.  33 U.S.C. § 1365(a). "Effluent standard or limitation" includes any NPDES permit condition or requirement.  33 U.S.C. § 1365(f).

17.  Under the CWA, state administrative enforcement actions for penalties do not preclude citizen enforcement actions for penalties when the state's administrative enforcement laws and regulations are not comparable to Section 309(g) of the CWA.  33 U.S.C. § 1319(g)(6)(A)(ii) & (iii).  Florida's statutes and FDEP's regulations on administrative penalty actions for NPDES permit violations are not comparable to Section 309(g).  For example, FDEP's authority to assess administrative penalties for such violations in any one proceeding is

capped at $10,000.  In contrast, Section 309(g) caps EPA's authority to assess administrative penalties for such penalties in any one proceeding at $125,000.  Accordingly, administrative consent orders entered into by FDEP and Pilgrim's do not preclude any part of this action.

## PARTIES

### Environment Florida

18.  Plaintiff Environment America, Inc. is a Colorado non-profit corporation doing business in Florida as Environment Florida ("Environment Florida").  Environment America has more than 20,000 dues paying members in Florida, and nearly 3,000 dues paying members in the counties surrounding the Suwannee River.

19.  Environment Florida brings this suit on behalf of its individual members who are adversely affected by the Plant's violations of discharge limits for chronic toxicity, specific conductance, nitrogen, and carbonaceous biological oxygen demand ("CBOD").  These violations have deleterious impacts on Environment Florida's members' use and enjoyment of the Suwannee River and the environment in which Environment Florida's members live, work, and recreate.

20.  Environment Florida advocates for clean air, clean water, and the preservation of Florida's natural resources.

21.  Among other activities in pursuit of these goals, Environment Florida researches and distributes analytical reports on environmental issues, advocates before legislative and administrative bodies, engages in litigation, and conducts public education programs.

22.  Environment Florida has members who live, own homes, or spend time near the Plant and/or the Suwannee River, and who participate in recreational activities in, on, or near the Suwannee River downstream of the Plant.

23.  Environment Florida has members who are adversely affected by Pilgrim's NPDES permit violations.

24.  "Person" in the CWA is defined to include "corporation."  33 U.S.C. § 1362(5). Environment Florida is a corporation and thus a "person" under the CWA.

**Pilgrim's Pride Corporation**

25.  Pilgrim's is a corporation.

26.  Pilgrim's is a "person" within the meaning of 33 U.S.C. § 1362(5) of the CWA.

27.  Pilgrim's operates chicken processing plants and prepared-foods facilities.

28.  Pilgrim's owns the Plant.

29.  Pilgrim's operates the Plant.

30.  Pilgrim's is majority-owned by JBS S.A., through JBS S.A.'s indirect wholly-owned subsidiaries.

31.  On page 1 of Pilgrim's 2016 Annual Report on Form 10-K filed with the United States Securities and Exchange Commission, Pilgrim's stated, "JBS S.A., through its indirect wholly-owned subsidiaries (together, "JBS"), beneficially owns 78.5% of our outstanding common stock."

32.  JBS S.A. is the largest meat (beef, chicken, and pork) processing company in the world.

33.  Pilgrim's is the second largest chicken producer in the world.

34.  On page 2 of Pilgrim's 2016 Annual Report on Form 10-K filed with the United States Securities and Exchange Commission, Pilgrim's stated that "[i]n 2016, we produced 8.1 billion pounds of chicken products, generating approximately $7.9 billion in net sales and approximately $440.5 million in net income attributable to Pilgrim's."

## JURISDICTION, VENUE, AND NOTICE

35.  This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a)(1) (the CWA "citizen suit" provision) and 28 U.S.C. § 1331.

36.  Venue lies in this District under 33 U.S.C. § 1365(c)(1) because the Plant is located within this District.

37.  Pursuant to 28 U.S.C. § 2201(a), this Court may issue a declaratory judgment determining that Pilgrim's has violated its permit and determining the number of days of violations Pilgrim's has committed.

38.  On December 30, 2016, counsel for Environment Florida mailed a letter (the "Notice Letter") by certified mail, return receipt requested, to William W. Lovette, president and CEO of Pilgrim's Pride Corporation and Thomas Giovannini, Complex Manager of the Plant.  A copy of the Notice Letter is attached as Exhibit 1.  The Notice Letter is incorporated by reference herein.

39.  Mr. Lovette and Mr. Giovannini received the Notice Letter.  Copies of return receipts for Mr. Lovette and Mr. Giovannini are in Exhibit 2, attached hereto.

40.  On December 30, 2016, counsel for Environment Florida mailed the Notice Letter by certified mail, return receipt requested, to Corporation Service Company, registered agent for Pilgrim's Pride Corporation.  Corporation Service Company received the Notice Letter.  A copy of the return receipt for Corporation Service Company is attached in Exhibit 2.

41.  On December 30, 2016, counsel for Environment Florida mailed the Notice Letter by certified mail, return receipt requested, to the Administrator of EPA and the Regional Administrator of EPA Region 4.  The Administrator and Region 4 Administrator received the Notice Letter.  Copies of the return receipts for the Administrator and Region 4 Administrator are attached in Exhibit 2.

42.  On December 30, 2016, counsel for Plaintiff mailed the Notice Letter, return receipt requested, to Jonathan Steverson, Secretary, and Gregory J. Strong, Northeast District, of FDEP. Mr. Steverson and Mr. Strong received the Notice Letter.  Copies of the return receipts for Mr. Steverson and Mr. Strong are attached in Exhibit 2.

43.  The Notice Letter satisfies the pre-suit notice requirements of 33 U.S.C. § 1365(b)(1)(A) of the CWA.

44.  As of the date of the filing of this Complaint, neither EPA nor FDEP has commenced or is diligently prosecuting a civil or criminal action against Pilgrim's in a court of the United States or a state to require compliance with any of the effluent standards or limitations that Environment Florida alleges are being violated at the Plant.

45.  At or about the time this Complaint was filed, Environment Florida served a copy of it on the U.S. Attorney General and the Administrator of EPA, pursuant to 33 U.S.C. § 1365(c)(3).

46.  Section 403.121(2)(c) of the Florida Statutes provides: "An administrative proceeding shall be instituted by the department's serving of a written notice of violation upon the alleged violator by certified mail."  As used in this statute, the "department" is FDEP.

47.  FDEP did not serve a notice of violation on Pilgrim's for any of the toxicity violations alleged in this Complaint prior to the service of Environment Florida's Notice Letter.

48.  FDEP did not serve a notice of violation on Pilgrim's for any of the specific conductance violations alleged in this Complaint prior to the service of Environment Florida's Notice Letter.

49.  FDEP did not serve a notice of violation on Pilgrim's for any of the total nitrogen violations alleged in this Complaint prior to the service of Environment Florida's Notice Letter.

50.  FDEP did not serve a notice of violation on Pilgrim's for any of the CBOD violations alleged in this Complaint prior to the service of Environment Florida's Notice Letter.

51.  Pilgrim's did not receive a notice of violation from FDEP for any of the violations alleged in this Complaint prior to the service of Environment Florida's Notice Letter.

## THE PLANT

52.  The Plant is located at 19740 US Highway 90, Live Oak, Florida 32060, in Suwannee County.

53.  The Plant processes live poultry into fresh and frozen chicken meat products, and operates a broiler hatchery to produce chicks for distribution to growers.

54.  Poultry processing, the hatchery, and plant sanitation activities generate process wastewater at the Plant.

55.  Boiler/condenser blowdown operations, water treatment plant filtrate, sanitary wastes, and collected stormwater from industrial activity generate non-process wastewater at the Plant.

56.  Over the course of a year, the Plant produces an average daily flow of over one million gallons per day of wastewater that is discharged to the Suwannee River.

57.  When the Plant's wastewater treatment system is operating as intended, the wastewater is discharged to the Suwannee River through a series of steps.

58.  Process wastewater at the Plant is directed into a dissolved air flotation ("DAF") separation unit and then into an anaerobic basin.

59.  Non-process wastewater bypasses the DAF unit and joins the process wastewater in the anaerobic basin.

60.  The commingled waste stream then flows from the anaerobic basin into an anoxic basin, then into an aeration basin, and then is split into the north and south clarifiers.

61.  Activated sludge is returned to the anoxic basin and waste sludge is sent to an aerobic sludge digester.

62.  Wastewater from the secondary clarifiers may flow into either a lined, facultative polishing pond or directly to a pump station feeding the denitrification filters (or both) after which the wastewater stream receives pH adjustment and then flows to a chlorine contact chamber for disinfection.

63.  Following dechlorination, the wastewater is discharged to the Suwannee River through Outfall D-001.

64.  The wastewater discharged into the Suwannee River is also called the Plant's "effluent."

65.  Outfall D-001 is an 18-inch diameter steel pipe that extends approximately 20 feet from the shore and discharges into the Suwannee River.

66.  During the Suwannee River's low flow periods, the pipe is not always completely submerged.

67.  During the Suwannee River's low flow periods, the Plant's effluent discharging from the pipe can be seen.

68.  Waste sludge treated in the aerobic sludge digester is land-applied by spray irrigation to an on-site, 44-acre land application system (R-001).

### THE PLANT'S NPDES PERMIT

69.  FDEP issued an NPDES permit to Pilgrim's under the number FL0001465 - 001, and it has periodically reissued that permit under sequential secondary numbers (002, 003, *etc.*).  This

case concerns violations of reissued versions FL0001465 – 005 and FL0001465 – 006, which are referenced herein as the "2010 Permit" and the "2015 Permit," respectively.

**The 2015 Permit**

70.   On May 8, 2015, FDEP reissued the permit to "Pilgrim's Pride Corporation" as NPDES Permit No. FL0001465 – 006 ("the 2015 Permit").

71.   The 2015 Permit expires on May 7, 2020.

72.   Pilgrim's did not appeal the issuance of the 2015 Permit.

73.   Exhibit 3 is a copy of the 2015 Permit Pilgrim's received from FDEP.

74.   The 2015 Permit states on page 1:  "This permit does not constitute authorization to discharge wastewater other than as expressly stated in this permit."

75.   The 2015 Permit states in Section X.1:  "The terms, conditions, requirements, limitations and restrictions set forth in this permit are binding and enforceable pursuant to Chapter 403, Florida Statutes. Any permit noncompliance constitutes a violation of Chapter 403, Florida Statutes, and is grounds for enforcement action, permit termination, permit revocation and reissuance, or permit revision."

76.   The 2015 Permit states in Section X.5:  "The permittee shall take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

77.   The 2015 Permit states in Section X.5:  "It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit."

78.  The 2015 Permit states in Section X.7:  "The permittee shall at all times properly operate and maintain the Plant and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to achieve compliance with the conditions of this permit."

79.  Section I.A.1 of the 2015 Permit sets effluent limitations and monitoring requirements for wastewater discharges from Outfall D-001 to the Suwannee River.

80.  Section I.A.2 of the 2015 Permit requires that effluent samples for wastewater discharges from Outfall D-001 to the Suwannee River be taken at the monitoring site locations listed in Section I.A.1.

81.  Section I.C.3 of the 2015 Permit sets reporting requirements for wastewater discharges from Outfall D-001 to the Suwannee River.

82.  The 2015 Permit was a renewal of the previously-issued NPDES permit, FL0001465-005.

**The 2010 Permit**

83.  On May 6, 2010, FDEP reissued the permit to "Pilgrim's Pride Corporation" as NPDES Permit No. FL0001465 – 005 ("the 2010 Permit").

84.  The 2010 Permit expired on May 5, 2015.

85.  Pilgrim's did not appeal the issuance of the 2010 Permit.

86.  Exhibit 4 is a copy of the 2010 Permit Pilgrim's received from FDEP.

87.  The 2010 Permit states on page 1:  "This permit does not constitute authorization to discharge wastewater other than as expressly stated in this permit."

88.  The 2010 Permit states in Section IX.1:  "The terms, conditions, requirements, limitations and restrictions set forth in this permit are binding and enforceable pursuant to

Chapter 403, Florida Statutes. Any permit noncompliance constitutes a violation of Chapter 403, Florida Statutes, and is grounds for enforcement action, permit termination, permit revocation and reissuance, or permit revision."

89.  The 2010 Permit states in Section IX.5:  "The permittee shall take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

90.  The 2010 Permit states in Section IX.5:  "It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit."

91.  The 2010 Permit states in Section IX.7:  "The permittee shall at all times properly operate and maintain the Plant and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to achieve compliance with the conditions of this permit."

92.  Section I.A.1 of the 2010 Permit sets effluent limitations and monitoring requirements for wastewater discharges from Outfall D-001 to the Suwannee River.

93.  Section I.A.2 of the 2010 Permit requires that effluent samples for wastewater discharges from Outfall D-001 to the Suwannee River be taken at the monitoring site locations listed in Section I.A.1.

94.  Section I.C.3 of the 2010 Permit sets reporting requirements for wastewater discharges from Outfall D-001 to the Suwannee River.

### PILGRIM'S REPORTS TO FDEP

95.  Pilgrim's submits "discharge monitoring reports" ("DMRs") to FDEP.

12

96.  Pilgrim's submits DMRs to FDEP that contain information on the amounts of certain pollutants in the Plant's effluent.

97.  Pilgrim's submits DMRs to FDEP that contain information on the concentrations of certain pollutants in the Plant's effluent.

98.  Pilgrim's submits DMRs to FDEP that contain information on the toxicity of the Plant's effluent as measured in toxicity tests prescribed by FDEP.

99.  Pilgrim's submits DMRs regarding the Plant's effluent to FDEP on a monthly basis.

100.  The Plant's DMRs that are submitted to FDEP are signed by a principal executive officer or authorized agent for Pilgrim's.

101.  The Plant's DMRs that are submitted to FDEP are signed by the Plant's Complex Manager.

102.  The person who signs the Plant's DMRs certifies under penalty of law that the DMR and all attachments were prepared under his direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted, and that based on his inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of his knowledge and belief, true, accurate and complete.

103.  The person who signs the Plant's DMRs states that he is aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

104.  The 2015 Permit requires, and the 2010 Permit required, Pilgrim's to submit DMRs to FDEP.

105.   Pilgrim's DMRs for the Plant are publicly available on the FDEP's Electronic Document Management System, which is called "OCULUS."

106.   The information on the Plant's effluent contained in Exhibit 5 is information Pilgrim's submitted to FDEP.

107.   Exhibit 5 contains DMRs for the Plant that Pilgrim's submitted to FDEP.

108.   The 2015 Permit requires, and the 2010 Permit required, Pilgrim's to submit to FDEP quarterly bioassay laboratory reports on chronic definitive bioassay toxicity tests.

109.   Pilgrim's submits to FDEP quarterly bioassay laboratory reports that include chronic definitive bioassay toxicity tests.

110.   Pilgrim's quarterly bioassay laboratory reports for the Plant are publicly available on OCULUS.

111.   Exhibit 6 contains quarterly bioassay laboratory reports prepared for the Plant that Pilgrim's submitted to FDEP.

112.   Exhibit 7 is a Wastewater Compliance Inspection Report dated June 18, 2014 conducted by FDEP.

## COUNT I:  TOXICITY VIOLATIONS

113.   Paragraphs 1 through 112 are re-alleged and incorporated by reference herein.

114.   Whole effluent toxicity ("WET") describes the aggregate toxic effect of an aqueous sample (*e.g.*, a sample of wastewater effluent) as measured by a test organism's response (*e.g.*, lethality, or impaired growth or reproduction) upon exposure to the sample.  WET tests measure the total effect on aquatic organisms of exposure to pollutants in an effluent without requiring the identification of the specific pollutants.

115.   Florida Administrative Code ("F.A.C.") § 62-4.241 requires facilities subject to WET testing to meet certain limitations.

116.   F.A.C. § 62-4.241 is consistent with EPA requirements for WET testing.

117.   The Plant is subject to WET testing within the meaning of F.A.C. § 62-4.241.

**Whole Effluent Toxicity Provisions In The Permit**

118.   The requirements of F.A.C. § 62-4.241 are included in the 2015 Permit and the 2010 Permit.

119.   Section I.A.1 of the 2015 Permit specifies a minimum single sample limit of 100% for "Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*)" for discharge from Outfall D-001 at the Plant during the entire effective period of the 2015 Permit.  This provision of the permit also references Section I.A.10 of the permit.  Section I.A.10.a(1) of the 2015 Permit sets the following chronic whole effluent toxicity limitation for discharge from Outfall D-001: "In any routine or additional follow-up test for chronic whole effluent toxicity, the 25 percent inhibition concentration (IC25) for reproduction or growth shall not be less than 100% effluent."

120.   The limit described in the preceding paragraph means that the effluent from the Plant, without dilution (*i.e.*, at 100% strength), must not cause inhibition of reproduction or growth to more than 25% of test organisms placed in the effluent for a period of seven days.  The test organism is *Ceriodaphnia dubia*, a species of water flea.

121.   The limit described in the preceding two paragraphs is also in Sections I.A.1 and I.A.7.a(1) of the 2010 Permit, and was applicable during the entire effective period of the 2010 Permit.

122.   Section I.A.1 of the 2015 Permit requires quarterly monitoring of Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) for discharge from Outfall D-001 at the

Plant during the entire effective period of the 2015 Permit.  The same requirement is in Section I.A.1 of the 2010 Permit, and was applicable during the entire effective period of the 2010 Permit.  Section I.A.10.b(1) of the 2015 Permit requires routine WET tests to be conducted once every three months, the first test starting within 90 days of the most recent tests.  The same requirement is in § I.A.7.b(1) of the 2010 Permit.

**The 2010 Administrative Order**

123.  At the time FDEP issued the 2010 Permit, it issued Administrative Order AO-137 NE ("2010 AO") to Pilgrim's.  Pilgrim's is referred to as the "Permittee" in the 2010 AO.  The Plant is referred to as the "Facility" in the 2010 AO.

124.  The 2010 AO is contained in Exhibit 4.

125.  Paragraph 1 of the 2010 AO states: "The Permittee shall comply with the requirements of this Order, the Permit, and any subsequent revisions to the Permit."

126.  Paragraph 2 of the 2010 AO states, "During the interim period in which the Permittee is working to bring the Facility into compliance as required by this Order, the following monitoring and discharge limitations for … chronic toxicity shall apply at outfall D-001 in lieu of the applicable monitoring requirements contained in Part I.A.1 of the permit."  The 2010 AO does not specify any provisions to apply in lieu of the permit's *discharge* limitations for chronic toxicity.  The referenced "discharge limitations" specified in the 2010 AO read: "report."

127.  Paragraph 4 of the 2010 AO required Pilgrim's to complete a number of "action items" to address chronic toxicity.

128.  Paragraph 4(k) of the 2010 AO required that Pilgrim's "complete all steps to achieve compliance" by July 1, 2014.  Paragraph 4(k) of the 2010 AO also states:  "Any

16

revisions to the currently-permitted facility including treatment and/or incorporation of Department-approved regulatory relief shall be accomplished by the Department re-opening the permit."

129.   Paragraph 13 of the 2010 AO states: "This Order does not operate as a permit under Section 403.88 of the Florida Statutes.  This Order shall be incorporated by reference into DEP Permit FL0041556, which shall require compliance with the requirements of this Order."

130.   The 2010 AO did not override or nullify the 2010 Permit's requirement that "[i]n any routine or additional follow-up test for chronic whole effluent toxicity, the 25 percent inhibition concentration (IC25) for reproduction or growth shall not be less than 100% effluent."

131.   FDEP agrees that the 2010 AO did not override or nullify the chronic whole effluent toxicity limit in the 2010 Permit.  This is reflected in a 2015 administrative consent order, discussed below, in which FDEP cited Pilgrim's for nine violations of that limit occurring in 2013 and 2014, when the 2010 AO was in effect.

132.   The 2010 AO did not bring the Plant into compliance with the chronic whole effluent toxicity limit.

133.   The 2010 Permit was never re-opened or modified.

**The 2015 Administrative Consent Order**

134.   FDEP uses administrative consent orders to settle enforcement actions.

135.   FDEP and Pilgrim's signed administrative Consent Order OGC File No. 15-0150 ("2015 CO") in April 2015.

136.   Plant Complex Manager Thomas Giovannini and FDEP Northeast District Director Gregory Strong signed the 2015 CO.

137.   The 2015 CO was fully executed on April 10, 2015.

138.   The 2015 CO was fully executed before the issuance of the 2015 Permit on May 8, 2015.

139.   The 2015 CO is attached as Exhibit 8 to this Complaint.

140.   Page 1 of the 2015 CO states that FDEP "finds," and that Pilgrim's "admits," four enumerated paragraphs.

141.   Paragraph 4(a) of those enumerated paragraphs states that FDEP "finds" that Pilgrim's "violated the permit condition which establish [*sic*] limits for toxicity from February 2013 to December 2014, as shown in the Table below."  The referenced table lists the results of nine chronic whole effluent toxicity tests reported by Pilgrim's to FDEP.  In each of these tests the 25 percent inhibition concentration (IC25) for reproduction or growth was less than 100% effluent.

142.   Paragraph 4(b) of those enumerated paragraphs states that FDEP "finds that the discharges depicted above are violations of Rule 62-620.300(5), F.A.C., which requires the facility to operate in a manner that is consistent with the terms of the Permit, and Section 403.161(1), F.S, which states that it is a violation to cause pollution so as to harm or injure human health or welfare, animal, plant, aquatic life or property."

143.   Paragraph 25 of the 2015 CO set forth how notice of the Order was to be provided.

144.   Paragraph 25 of the 2015 CO required Pilgrim's to publish a notice of the Order in a newspaper of daily circulation in Suwannee County.  Paragraph 25 also specified the contents of such notice.

145.   Paragraph 6(a) of the 2015 CO states:  "Beginning the effective date of this Order, and lasting until December 31, 2016, the interim limit for toxicity is as shown in Table 1 below."

The referenced Table 1 required Pilgrim's to "report" on a bimonthly basis the results of its Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) testing.

146.   Paragraph 6(c) of the 2015 CO states:  "These monitoring requirements do not act as State of Florida Department of Environmental Protection Wastewater Permit effluent limitations, nor do they authorize or otherwise justify violation of the Florida Air and Water Pollution Control Act, Part 1, Chapter 403, F.S., during the pendency of this Order."

147.   Paragraph 18 of the 2015 CO states:  "Entry of this Order does not relieve Respondent [Pilgrim's] of the need to comply with applicable federal, state, or local laws, rules, or ordinances."

148.   F.A.C. § 62-620.325 governs revisions to NPDES permit conditions.  The procedures set out in F.A.C. § 62-620.325 were not used, and F.A.C. § 62-620.325 was not invoked, in the issuance of the 2015 CO.

149.   The 2015 CO did not amend or modify the NPDES permit for the Plant.

150.   The 2015 CO did not override or nullify the requirement in the 2010 Permit or the 2015 Permit that "[i]n any routine or additional follow-up test for chronic whole effluent toxicity, the 25 percent inhibition concentration (IC25) for reproduction or growth may not be less than 100% effluent."

151.   The 2015 CO was an exercise of enforcement discretion by FDEP.

152.   The 2015 CO required Pilgrim's to take certain steps in response to its chronic toxicity violations at the Plant.  The order refers to these steps as "corrective actions."  Among other things, Pilgrim's was required to submit a "Plan of Action" detailing steps necessary to achieve compliance with the chronic toxicity limit at the Plant.

153.   The 2015 CO required Pilgrim's to be in compliance with its Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) limit at the Plant by December 31, 2016.

154.   As is more fully set forth below, Pilgrim's continued to violate its NPDES permit limit for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) after the 2015 CO was issued.  Pilgrim's has continued to violate this limit after December 31, 2016.

155.   Paragraph 10 of the 2015 CO required Pilgrim's to pay $2,000 in civil penalties to FDEP by December 31, 2016, unless FDEP notified Pilgrim's that civil penalties had been waived in accordance with paragraph 17 of the Order.  Paragraph 17 of the 2015 CO states that FDEP, "for and in consideration of the complete and timely performance of all the obligations agreed to in this Order, hereby conditionally waive its right to seek judicial imposition of damages or civil penalties for the violations described above up to the date of the filing of this Order.  This waiver is conditioned upon Respondent's complete compliance with all of the terms of this Order."

156.   Pilgrim's did not pay $2,000 to FDEP by December 31, 2016.

157.   Pilgrim's paid $2,000 to FDEP on February 9, 2017.

**Violations Of The Permit's Whole Effluent Toxicity Requirements**

158.   Pilgrim's sends Plant effluent to an outside laboratory to conduct whole effluent toxicity testing.

159.   Pilgrim's reports the results of this WET testing of the Plant's effluent to FDEP.

160.   The 2015 Permit requires, and the 2010 Permit required, Pilgrim's to report the results of the Plant's whole effluent toxicity testing to FDEP.

161.   In the period 1/01/2016-1/31/2017, a single composite sample of the Plant's effluent measured 85.46% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

162.   In the period 9/01/2016-11/30/2016, a single composite sample of the Plant's effluent measured 38.30% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

163.   In the period 2/01/2016-4/30/2016, a single composite sample of the Plant's effluent measured 74% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

164.   In the period 11/01/2015-1/31/2016, a single composite sample of the Plant's effluent measured 71.64% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

165.   In the period 9/01/2015-10/31/2015 a single composite sample of the Plant's effluent measured 77.03% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

166.   In the period 6/01/2015-8/31/2015 a single composite sample of the Plant's effluent measured 67.43% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

167.   In the period 5/01/2015-5/31/2015 a single composite sample of the Plant's effluent measured 69.77% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

168.   In the period 12/01/2014-2/28/2015 a single composite sample of the Plant's effluent measured 59.54% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

169.   In the period 10/01/2014-11/30/2014 a single composite sample of the Plant's effluent measured 5.99% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

170.   In the period 6/01/2014-8/31/2014 a single composite sample of the Plant's effluent measured 55.62% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

171.   In the period 4/01/2014-5/31/2014 a single composite sample of the Plant's effluent measured 72% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

172.   In the period 2/01/2014-3/31/2014 a single composite sample of the Plant's effluent measured 42.09% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

173.   In the period 12/01/2013-12/31/2013 a single composite sample of the Plant's effluent measured 81.2% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

174.   In the period 12/01/2013-12/31/2013 a single composite sample of the Plant's effluent measured 0% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

175.   In the period 12/01/2013-12/31/2013 a single composite sample of the Plant's effluent measured 0% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Pinephales promelas*).

176.   In the period 11/01/2013-11/31/2013 a single composite sample of the Plant's effluent measured 89.7% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

177.   In the period 5/01/2013-7/31/2013 a single composite sample of the Plant's effluent measured 65.2% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

178.   In the period 3/01/2013-4/30/2013 a single composite sample of the Plant's effluent measured 87% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

179.   In the period 3/01/2013-4/30/2013 a single composite sample of the Plant's effluent measured 90% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

180.   In the period 2/01/2013-3/01/2013 a single composite sample of the Plant's effluent measured 73.5% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

181.   In the period 1/01/2012-3/30/2012 a single composite sample of the Plant's effluent measured 77.64% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

182.   Pilgrim's reported the Chronic Whole Effluent Toxicity measurements for the Plant's effluent set forth in paragraphs 161-181 to FDEP.

183.   Pilgrim's submitted the Plant's DMRs and the bioassay laboratory reports containing the Chronic Whole Effluent Toxicity measurements for the Plant's effluent set forth in paragraphs 161-181 to FDEP.

184.   As set forth in the 2015 CO, FDEP determined that Pilgrim's violated its NPDES permit limit for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) with the following toxicity results of the Plant's effluent for the following months:  February 2013 – 73.5%; March 2013 – 87%; March 2013 – 90%; May 2013 – 65%; November 2013 – 90%; December 2013 – 82%; February 2014 – 42%; October 2014 – 6%; December 2014 – 60%.

185.   Pilgrim's violated its NPDES permit for each time period listed above during which the Plant's effluent measured less than 100% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

186.   Pilgrim's violated the CWA for each time period listed above during which the Plant's effluent measured less than 100% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*).

187.   On each day the Plant's effluent measured less than 100% for Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*), the Plant's effluent was more toxic than allowed by its NPDES permit.

188.   FDEP determined that Pilgrim's toxicity violations as set forth in paragraph 184 caused pollution so as to harm or injure human health or welfare, animal, plant, aquatic life or property.

189.   Stephen L. James, Southeast Director of Environmental Engineering for Pilgrim's Pride, wrote a letter to Herndon Sims of FDEP dated January 24, 2017, indicating that Pilgrim's does not fully understand the cause of the chronic toxicity "problem."  In the same letter, Mr. James stated that the addition of "antimicrobial interventions in more locations in more of the process" has potentially added to the toxicity of the Plant's effluent.  Exhibit 9 attached hereto is the letter Mr. James wrote to Mr. Sims.

190.   Plaintiffs are unaware of any measures Pilgrim's has taken that would assure that in all routine or additional follow-up tests for chronic whole effluent toxicity, the 25 percent inhibition concentration (IC25) for reproduction or growth will not be less than 100% effluent.

191.   Plaintiffs are unaware of any measures Pilgrim's has taken that would assure compliance with the Chronic Whole Effluent Toxicity, 7-Day IC25 (*Ceriodaphnia dubia*) limit for the Plant.

## COUNT II:  SPECIFIC CONDUCTANCE

192.   Paragraphs 1 through 191 are re-alleged and incorporated by reference herein.

193.   Specific conductance is a measure of the ability of water to carry an electrical current through a centimeter of water.  Absolutely pure water is a poor conductor of electricity.

Water – and wastewater effluent – will register elevated conductivity when certain pollutants are present.

**The Permit Provisions For Specific Conductance**

194.   Section I.A.1 of the 2015 Permit sets a maximum daily specific conductance limit of 1,275 μmhos/cm, which is applicable to the effluent discharge from Outfall D-001 at the Plant during the entire effective period of the 2015 Permit.

195.   Section I.A.1 of the 2015 Permit requires weekly monitoring of specific conductance for discharge from Outfall D-001 at the Plant during the entire effective period of the 2015 Permit.

196.   Section I.A.1 of the 2010 Permit set a maximum daily specific conductance limit of 1,275 μmhos/cm, which was applicable to the effluent discharge from Outfall D-001 at the Plant during the entire effective period of the 2010 Permit.

197.   Section I.A.1 of the 2010 Permit required weekly monitoring of specific conductance for discharge from Outfall D-001 at the Plant during the entire effective period of the 2010 Permit.

**Violations Of The Permit's Specific Conductance Requirements**

198.   In the period 12/1/2016-12/31/2016, the Plant's effluent measured 1,358 μmhos/cm for specific conductance.

199.   In the period 11/01/2016-11/30/2016, the Plant's effluent measured 1,491 μmhos/cm for specific conductance.

200.   In the period 6/01/2016-6/30/2016, the Plant's effluent measured 1,353 μmhos/cm for specific conductance.

201.  In the period 4/01/2016-4/30/2016, the Plant's effluent measured 1,323 µmhos/cm for specific conductance.

202.  In the period 1/01/2016-1/31/2016, the Plant's effluent measured 1,277 µmhos/cm for specific conductance.

203.  In the period 12/01/2015-12/31/2015, the Plant's effluent measured 1,390 µmhos/cm for specific conductance.

204.  In the period 11/01/2015-11/30/2015, the Plant's effluent measured 1,311 µmhos/cm for specific conductance.

205.  In the period 10/01/2015-10/30/2015, the Plant's effluent measured 1,310 µmhos/cm for specific conductance.

206.  In the period 9/01/2015-/30/2015, the Plant's effluent measured 1,377 µmhos/cm for specific conductance.

207.  In the period 8/01/2015-8/31/2015, the Plant's effluent measured 1,291 µmhos/cm for specific conductance.

208.  In the period 5/01/2015-5/31/2015, the Plant's effluent measured 1,286 µmhos/cm for specific conductance.

209.  In the period 3/01/2015-3/31/2015, the Plant's effluent measured 1,300 µmhos/cm for specific conductance.

210.  In the period 2/01/2015-2/28/2015, the Plant's effluent measured 1,400 µmhos/cm for specific conductance.

211.  In the period 1/01/2015-1/31/2015, the Plant's effluent measured 1,300 µmhos/cm for specific conductance.

212.   In the period 1/01/2015-1/31/2015, the Plant's effluent measured 1,300 µmhos/cm for specific conductance.

213.   In the period 8/01/2014-8/312014, the Plant's effluent measured 1,309 µmhos/cm for specific conductance.

214.   In the period 6/01/2012-6/30/2012, the Plant's effluent measured 1,300 µmhos/cm for specific conductance.

215.   Pilgrim's reported the specific conductance measurements for the Plant's effluent set forth in paragraphs 198 - 214 to FDEP.

216.   Pilgrim's submitted the Plant's DMRs containing the specific conductance measurements for the Plant's effluent set forth in paragraphs 198 - 213 to FDEP.

217.   FDEP's Wastewater Compliance Inspection Report dated June 18, 2014 contains the specific conductance measurement set forth in paragraph 214.

218.   The February 3, 2017, memo from FDEP Wastewater Inspector Herndon Sims regarding the Plant (referred to in the memo as the "facility") stated that "[d]uring the period May 2015 to September 2016, the facility failed to meet the imposed permit limits as shown below."  The referenced Table 1 in the memo lists "Specific Conductance Exceedances" of the daily maximum limit of 1,275 µmhos/cm as follows:  5/31/2015 – 1286, 8/31/2015 – 1291, 9/30/2015 – 1377, 10/31/2015 – 1310, 11/30/2015 – 1311, 12/31/2015 – 1390, 1/31/2016 – 1277, 4/30/2016 – 1323, 6/30/2016 – 1353, 11/30/2016 – 1491, 12/31/2016 – 1358.  The memo is attached as Exhibit 10.  The memo is publicly available on OCULUS.

219.   Pilgrim's violated its NPDES permit each day the Plant's effluent measured more than 1,275 µmhos/cm for specific conductance.

220.   Pilgrim's violated the CWA each day the Plant's effluent measured more than 1,275 μmhos/cm for specific conductance.

221.   In his January 24, 2017, letter to Herndon Sims of DEP, Stephen James of Pilgrim's stated, "Specific conductivity has been an intermittent issue with no discernable source."  In the same letter, Mr. James stated that the addition of "antimicrobial interventions in more locations in more of the process" has added to the conductivity of the Plant's effluent.  Mr. James's letter is publicly available on OCULUS.

**The 2010 Administrative Order**

222.   Paragraphs 123 through 133 are re-alleged and incorporated by reference herein.

223.   Paragraph 2 of the 2010 AO states, "During the interim period in which the Permittee is working to bring the Facility into compliance as required by this Order, the following monitoring and discharge limitations for …specific conductance shall apply at outfall D-001 in lieu of the applicable monitoring requirements contained in Part I.A.1 of the permit." The 2010 AO does not specify any provisions to apply in lieu of the permit's *discharge* limitations for specific conductance.  The referenced "discharge limitations" specified in the 2010 AO read: "report."

224.   Paragraph 3 of the 2010 AO required Pilgrim's to complete a number of "action items" to address specific conductance.

225.   Paragraph 3(k) of the 2010 AO states that, by July 1, 2014, "The Permittee shall complete all steps to achieve compliance.  Any revisions to the currently-permitted facility including treatment and/or incorporation of Department-approved regulatory relief shall be accomplished by the Department re-opening the permit."

226.   The 2010 AO did not override or nullify the 2010 Permit's requirement that the Plant's effluent measure no more than 1,275 μmhos/cm for specific conductance.

227.   Plaintiffs are unaware of any measures Pilgrim's has taken that would assure that the specific conductance of the Plant's effluent will not exceed 1,275 μmhos/cm.

228.   Plaintiffs are unaware of any measures Pilgrim's has taken that would eliminate all sources of elevated conductivity of the Plant's effluent.

229.   The 2010 AO did not result in the Plant achieving compliance with the specific conductance limit.

## COUNT III:  TOTAL NITROGEN

230.   Paragraphs 1 through 229 are re-alleged and incorporated by reference herein.

**Total Nitrogen Provisions In The Permit**

231.   Section I.A.1 of the 2015 Permit sets a maximum annual limit of 114,245 pounds of total nitrogen in the Plant's wastewater discharged from Outfall D-001 during the entire effective period of the permit.  This limit is required to be calculated as an "annual mass load" ("AML").  The AML for total nitrogen is required to be computed on a rolling (or moving) twelve-month period.  The required calculation is the sum of the twelve most recent monthly mass loads of total nitrogen, starting from the current reporting period and extending through the eleven previous months.

232.   Section I.A.1 of the 2015 Permit requires monthly calculation of the total nitrogen AML in effluent discharged from D-001 during the entire effective period of the 2015 Permit.

**Violations Of The Permit's Total Nitrogen Requirement**

233.   In the period 12/01/2015-12/31/2015 the AML for total nitrogen in the Plant's effluent was computed as 118,260 pounds.

234.  In the period 1/01/2016-1/31/2016 the AML for total nitrogen in the Plant's effluent was computed as 124,751 pounds.

235.  In the period 3/01/2016-3/31/2016 the AML for total nitrogen in the Plant's effluent was computed as 128,623 pounds.

236.  In the period 6/01/2016-6/30/2016 the AML for total nitrogen in the Plant's effluent was computed as 129,039 pounds.

237.  In the period 7/01/2016-7/31/2016 the AML for total nitrogen in the Plant's effluent was computed as 123,354 pounds.

238.  In the period 8/01/2016-8/31/2016 the AML for total nitrogen in the Plant's effluent was computed as 122,267 pounds.

239.  In the period 9/01/2016-9/30/2016 the AML for total nitrogen in the Plant's effluent was computed as 132,301 pounds.

240.  In the period 10/01/2016-10/30/2016 the AML for total nitrogen in the Plant's effluent was computed as 127,849 pounds.

241.  In the period 11/01/2016-11/30/2016 the AML for total nitrogen in the Plant's effluent was computed as 126,338 pounds.

242.  Pilgrim's reported the AMLs for total nitrogen in the Plant's effluent set forth in paragraphs 233 - 241 to FDEP.

243.  The AMLs for total nitrogen in the Plant's effluent as set forth in paragraphs 233 - 241 were reported by Pilgrim's to FDEP in the Plant's DMRs.

244.  In his February 3, 2017, memo, FDEP Wastewater Inspector Sims stated that "[d]uring the period May 2015 to September 2016, the facility failed to meet the imposed permit limits as shown below."  The referenced Table 7 in the memo lists "Total Nitrogen (Annl Tot)-

30

Mass Loading" exceedances as follows, in pounds per year:  6/30/216 – 129039.639, 7/31/2016

– 123354.579, 8/31/2016 – 122267.554, 9/30/2016 – 132301.494, 10/31/2016 – 127849.303.

245.   Pilgrim's violated its NPDES permit each day of each month in which the AML of

total nitrogen was computed to be in excess of 114,245 pounds.

246.   Pilgrim's violated the CWA each day of each month in which the AML of total

nitrogen was computed to be in excess of 114,245 pounds.

247.   A February 27, 2017, letter to the National Environmental Law Center from

Attorney Winston Borkowski on behalf of Pilgrim's Pride stated with respect to total nitrogen

that "damaged denitrifying filters were identified as the likely source of the exceedances."  Mr.

Borkowski stated that the damage had been repaired, but that "further assessment of the

denitrifying system, and refurbishing if necessary, will occur over the next two to three months."

Mr. Borkowski also stated that "no TN exceedances have occurred since October of 2016."  A

copy of this letter is attached as Exhibit 11, and incorporated by reference herein.

248.   The Plant reported another violation of the total nitrogen limit again in November

2016.  Pilgrim's has attributed that violation to a calculation error.

249.   Pilgrim's has not given assurance that it will be able to anticipate and remedy

problems with its denitrifying filter to prevent total nitrogen violations, or that it will be in

compliance with the total nitrogen limit in the future.

### COUNT IV:  CARBONACEOUS BIOLOGICAL OXYGEN DEMAND

250.   Paragraphs 1 through 249 are re-alleged and incorporated by reference herein.

251.   BOD is the amount of dissolved oxygen needed (*i.e.*, demanded) by aerobic

biological organisms to break down organic material present in a given water sample at certain

temperature over a specific time period.  BOD is an indication of how much oxygen will be

utilized by the organic matter in wastewater effluent as it decomposes in the receiving water after discharge.

252.   "Carbonaceous BOD" ("CBOD") is a method defined test that measures the depletion of dissolved oxygen by biological organisms in a body of water in which the contribution from nitrogenous bacteria has been suppressed.

**Carbonaceous Biological Oxygen Demand Provisions In The Permi**

253.   Section I.A.1 of the 2015 Permit requires a single sample of effluent to be measured for CBOD weekly.

***Single Sample***

254.   Section I.A.1 of the 2015 Permit sets a maximum mg/L limit for CBOD at 24.3 for a single sample of effluent.

255.   Section I.A.1 of the 2015 Permit also sets a maximum lb/day limit for CBOD at 211 for a single sample of effluent.

***Monthly Average***

256.   Section I.A.1 of the 2015 Permit also sets a maximum monthly average limit for CBOD at 18 mg/L.

257.   Section I.A.1 of the 2015 Permit also sets a maximum monthly average limit for CBOD at 156 lb/day.

**Violations Of The CBOD Provisions In The Permit**

***Single Sample Violations***

258.   In the period 3/01/2016-3/31/2016 the CBOD of a sample of the Plant's effluent measured 73.0 mg/L.

259.  In the period 4/01/2016-4/30/2016 the CBOD of a sample of the Plant's effluent measured 99.0 mg/L.

260.  In the period 5/01/2016-5/31/2016 the CBOD of a sample of the Plant's effluent measured 26.0 mg/L.

261.  In the period 1/01/2017-1/31/2017 the CBOD of a sample of the Plant's effluent measured 26.0 mg/L.

262.  In the period 3/01/2016-3/31/2016 the CBOD of a sample of the Plant's effluent measured 622 lbs.

263.  In the period 4/01/2016-4/30/2016 the CBOD of a sample of the Plant's effluent measured 888 lbs.

264.  In the period 5/01/2016-5/31/2016 the CBOD of a sample of the Plant's effluent measured 240 lbs.

265.  In the period 1/01/2017-1/31/2017 the CBOD of a sample of the Plant's effluent measured 277 lbs.

266.  Pilgrim's violated its NPDES permit each day the CBOD of its effluent measured in excess of 24.3 mg/L.

267.  Pilgrim's violated the CWA each day the CBOD of its effluent measured in excess of 24.3 mg/L.

268.  Pilgrim's violated its NPDES permit each day the CBOD of its effluent measured in exceeded 211 lb/day.

269.  Pilgrim's violated the CWA each day the CBOD of its effluent measured in exceeded 211 lb/day.

***Monthly Average Violations***

270.   In the period 3/01/2016-3/31/2016 the monthly average of CBOD measured in sampled Plant effluent was 361 lbs/day.

271.   In the period 3/01/2016-3/31/2016 the monthly average of CBOD measured in sampled Plant effluent was 40.1 mg/L.

272.   In the period 4/01/2016-4/30/2016 the monthly average of CBOD measured in sampled Plant effluent was 448 lbs/day.

273.   In the period 4/01/2016-4/30/2016 the monthly average of CBOD measured in sampled Plant effluent was 54.8 mg/L.

274.   Pilgrim's reported to FDEP the CBOD measured in the Plant's effluent set forth in paragraphs 258 – 265 and 270 - 273.

275.   The CBOD measured in the Plant's effluent as set forth in paragraphs 253 – 273 was reported by Pilgrim's to FDEP in the Plant's DMRs.

276.   Pilgrim's violated its NPDES permit each day of each month in which the monthly average of CBOD of its effluent measured in excess of 18 mg/L.

277.   Pilgrim's violated the CWA each day of each month in which the monthly average of CBOD of its effluent measured in excess of 18 mg/L.

278.   Pilgrim's violated its NPDES permit each day of each month in which the monthly average of the CBOD of its effluent exceeded 156 lb/day.

279.   Pilgrim's violated the CWA each day of each month in which the monthly average of the CBOD of its effluent exceeded 156 lb/day.

280.   In his February 3, 2017, memo, FDEP Wastewater Inspector Sims stated that "[d]uring the period May 2015 to September 2016, the facility failed to meet the imposed permit limits as shown below."  The referenced Table 3 in the memo lists the following "CBOD

Exceedances (Daily Max)": 3/31/2016 – 73.0 mg/L, 4/30/2016 – 99.0 mg/L, and 5/31/2016 –

26.0 Table 4 in the memo lists the following "CBOD Exceedances (Max)-Mass Loading":

3/31/2016 – 622 lbs/day, 4/30/2016 – 888 lbs/day, 5/31/2016 – 240 lbs/day. Table 5 in the

memo lists the following "CBOD Exceedances (Mo Avg)-Mass Loading": 3/31/2016 – 40.1

lbs/day, and 4/30/2016 – 54.8 lbs/day.

## ADVERSE EFFECTS OF POLLUTANTS DISCHARGED BY THE PLANT

### Whole Effluent Toxicity

281.   The whole effluent toxicity of a facility's wastewater refers to the aggregate toxic

effect on aquatic organisms from all pollutants contained in that wastewater.

282.   Whole effluent toxicity (WET) testing is one way in which EPA implements the

Clean Water Act's prohibition of the discharge of toxic pollutants in toxic amounts.

283.   Violations of whole effluent toxicity limits are an indication that the tested effluent

is toxic to, and can cause harm to, aquatic life.  In general, the greater the degree of the violation,

the greater the likelihood and severity of harm to aquatic life.

284.   Survival rates in WET tests that are well below the legal toxicity standard indicate

that the effluent is poisonous to aquatic life and has the potential to cause severe harm to the

water body.

### Specific Conductance

285.   Specific conductance is used as a way to estimate salinity and total dissolved solids,

both of which affect water quality and aquatic life.

286.   Exceedances of effluent limitations for specific conductance may indicate high

quantities of ions of chloride, phosphate, nitrate, or sulfate.

287.   Aquatic plants and animals are adapted for a particular level of salinity and certain freshwater fish will die if water becomes too salty due to pollution.

288.   A specific conductance measurement that is significantly elevated may indicate that the salinity of the effluent is too high for native organisms.

**Nitrogen**

289.   Nitrogen is a nutrient.

290.   Nitrogen can contribute to the growth of aquatic plant life, such as algae.

291.   Nitrogen in a river system can contribute to an excessive rate of algal growth in the system, and too much nitrogen can contribute to harmful levels of algae.

292.   Significant increases in algae can harm water quality, decrease food resources and habitats, and decrease the oxygen that fish and other aquatic life need to survive.

293.   Large growths of algae are called "algal blooms."  Such blooms can severely reduce or eliminate oxygen in the water, leading to fish illnesses and/or death.

294.   Harmful algal blooms sometimes create toxins that can kill fish and other animals. After being consumed by small fish and shellfish, these toxins can move up the food chain and hurt larger predator fish and other larger animals, such as manatees.

295.   Even where algal blooms are not toxic, they can hurt aquatic life by blocking out sunlight and clogging fish gills.

296.   Some algal blooms are potentially harmful to humans because they produce elevated toxins and bacterial growth that can make people sick.  People can be exposed to such toxins and bacteria by recreating or working in polluted water, consuming tainted fish or shellfish, or drinking contaminated water.

297.   Algal blooms can smother vegetation and discolor water.

298.   Nutrient pollution can create "dead zones," areas where the water has little or no oxygen and where aquatic life cannot survive.  This condition is also known as hypoxia.  Algal blooms can cause hypoxia when the algae die and then consume the oxygen in the water as they decompose.  Aquatic animals must leave hypoxic areas or face death.  Young fish and seafloor dwellers like crabs and clams are most likely to die in hypoxic areas because of their inability to flee.

299.   Consumption of water with nitrate nitrogen can be harmful to infants and juvenile animals, as it can interfere with the blood's ability to carry oxygen.

**Carbonaceous Biological Oxygen Demand**

300.   High CBOD levels in wastewater can contribute to low levels of dissolved oxygen in the receiving water.

301.   Low levels of dissolved oxygen can have detrimental effects on a water body.  Low levels of dissolved oxygen can be harmful and/or lethal to aquatic life.  Low levels of dissolved oxygen can cause fish kills.

302.   The harmful effects of low dissolved oxygen levels can be exacerbated by higher ambient water temperatures.

**PLAINTIFF'S MEMBERS ARE HARMED BY PILGRIM'S VIOLATONS**

303.   FDEP has designated the Suwannee River a "Special Waters" of the Outstanding Florida Waters.  The Suwannee is one of only 41 rivers, out of Florida's roughly 1,700 rivers, to receive such a designation.  This designation is based on a determination the waters are of exceptional recreational or ecological significance and a finding that the environmental, social and economic benefits of the designation outweigh the environmental, social and economic costs, pursuant to Rule 62-302.700(5), F.A.C.

304.   The Plant is located on the Middle Suwannee River.  The Middle Suwannee includes a number of important conservation areas, including three state parks, other parks owned by the Suwannee River Water Management District, and various county and municipal parks.

305.   Recreation on the Middle Suwannee includes swimming, boating, water skiing, fishing, kayaking, and canoeing.

306.   Manatees have been spotted in Middle Suwannee springs.

307.   Members of Environment Florida live on or near, own property on or near, work on or near, and recreate near, on, and in the Suwannee River.

308.   Environment Florida's members consider the Suwannee River to be an important resource, and an aesthetically significant fixture of the area in which they live, and they desire that it be kept as clean and vibrant as possible.

309.   Environment Florida has members who want the Suwannee River to have as little pollution in it as possible.

310.   Environment Florida has members who swim, canoe, kayak, dive, fish, view wildlife, take walks, conduct research, bicycle, boat, and engage in other activities on, in, and by the Suwannee River and its springs downstream of the Plant.

311.   Environment Florida's members' enjoyment of these activities is lessened by their knowledge of the Plant's pollutant discharge violations and by the effects of the Plant's discharges on the River.  Some of Environment Florida' members have curtailed these activities as a result.

312.  Environment Florida has members who do not want to observe algal blooms in the Suwannee River.  Plaintiff has members who have seen, and are bothered by, large accumulations of algae in the Suwannee River downstream of the Plant.

313.  Environment Florida has members who do not fish in the Suwannee River as often as they used to because they have seen a decline in the number of fish due to the pollutants discharged by the Plant.

314.  Environment Florida has members who do not dive in the Suwannee River as often as they used to because of the increase in algae due to the pollutants discharged by the Plant.

315.  Environment Florida has members who live on the Suwannee River who are concerned that the pollutants discharged by the Plant reach their property.

316.  Environment Florida has members who swim in the Suwannee River and are concerned that the pollutants discharged by the Plant will negatively affect their health.

317.  Environment Florida has members who are afraid to let their children, grandchildren, or dogs swim in the Suwannee River due to the pollutants discharged by the Plant.

318.  Environment Florida has members who are afraid to eat the fish they've caught in the Suwannee River due to the pollutants discharged by the Plant.

319.  Environment Florida's members want to preserve the aquatic life and wildlife in, on, and by the Suwannee River as much as possible, and want as little pollution in the River for the protection of that wildlife.

320.  The actual and threatened harm to Environment Florida's members would be redressed by an injunction, penalty, or other relief that prevents or deters further violations of the

NPDES Permit and/or that remediates harm that has already been caused to the Suwannee River and its environs by pollutant discharges.

## **RELIEF REQUESTED**

Plaintiffs request that this Court:

a.   Declare Defendant Pilgrim's to have violated and to be in violation of the Clean Water Act and the Plant's NPDES permit by committing each of the violations described above in Counts I through IV, including similar violations that occur after the filing of this Complaint;

b.   Determine the number of days of violation committed by Defendant;

c.   Order Defendant to comply with the Clean Water Act and the Plant's NPDES permit, and to refrain from further violations of the effluent standards and limitations in the permit;

d.   Order Defendant to implement measures to remedy, mitigate, or offset the harm to the environment caused by the violations alleged above;

e.   Assess an appropriate civil penalty against Defendant for each day of violation of the Clean Water Act and the NPDES permit, as provided by 33 U.S.C. § 1319(d);

f.   Award Plaintiffs their costs of litigation (including reasonable attorney and expert witness fees), as provided by 33 U.S.C. § 1365(d);

g.   Order such other relief as the Court deems appropriate.


Dated:  March 9, 2017                                /s/ Andrew Bonderud
                                                     Andrew M. Bonderud, (fl-102178)
                                                     The Bonderud Law Firm, P.A.
                                                     301 W Bay St #1433
                                                     Jacksonville, FL 32202
                                                     904-438-8082
                                                     Email: bonderudlaw@gmail.com

TRIAL COUNSEL

Heather A. Govern
Joshua R. Kratka
*Pro hac vice motion to be filed*
National Environmental Law Center
294 Washington Street, Suite 500
Boston, MA 02108
(617) 747-4301
Email: govern.nelc@gmail.com

David A. Nicholas
*Pro hac vice motion to be filed*
20 Whitney Road
Newton, Massachusetts 02460
(617) 964-1548
Email: dnicholas@verizon.net

ATTORNEYS FOR PLAINTIFF