UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

ENVIRONMENT AMERICA, INC.,
d/b/a ENVIRONMENT FLORIDA and
SIERRA CLUB

    Plaintiffs,                                   Case No: 3:17-cv-272-32 TJC-JRK

    v.

PILGRIM'S PRIDE CORPORATION,

    Defendant.

## PLAINTIFFS' SUR-REPLY OPPOSING DEFENDANT'S MOTION TO DISMISS

Plaintiffs submit this sur-reply to Pilgrim's Pride's Reply (ECF 19, "Reply") to Plaintiffs' Opposition to Defendant's Motion to Dismiss (ECF 13, "Plaintiffs' Response").

### I. FDEP'S 2017 CONSENT ORDER CONFIRMS THAT PLAINTIFFS MADE A GOOD FAITH ALLEGATION OF CONTINUING VIOLATIONS.

Pilgrim's Reply focuses on FDEP's June 12, 2017, Consent Order (ECF 19-3, "2017 Order"), which was issued after the Amended Complaint (ECF 6) was filed. The 2017 Order is much the same as the draft of the 2017 Order ("Draft Order"), which was discussed in Plaintiffs' Response (ECF 13, pp. 14-160).[1] And like the Draft Order, the 2017 Order actually *supports* the good faith basis for Plaintiffs' allegations that violations were ongoing when the complaint and amended complaint were filed – which is the salient issue presented in the motion to dismiss.

First, the order directs Pilgrim's to "submit a proposed solution ('Solution')…describing short term and long term action items to…*meet final effluent limits* for specific conductance,

---
[1] The Draft Order was attached as Exhibit 1 to the Govern Declaration (ECF 13-2) that was submitted with Plaintiffs' Response. The Draft Order was publicly available before the Amended Complaint was filed and was reviewed by Plaintiffs prior to filing the Amended Complaint.

1

carbonaceous BOD, … total nitrogen and chronic toxicity as specified by the permit." ECF 19-3, p. 8, ¶ 8 (emphasis added). If Pilgrim's were already in compliance with those limits, this directive would be unnecessary.

Second, the 2017 Order directs Pilgrim's to submit a "Plan of Study" for toxicity that "shall include a time schedule … *by which compliance with permit toxicity limits shall be achieved*," *id.*, p. 11, ¶ 8(d)(1) (emphasis added), clearly indicating that compliance has not yet been achieved. The 2017 Order also expressly states that the Plant has a "continuing intermittent toxicity problem." ECF 19-3, p. 6, ¶ 6(e); *see* Plaintiffs Response, ECF 13, pp. 4-5 (discussing case law holding that "intermittent violations" are "ongoing violations"). The 2017 Order makes clear that Pilgrim's and FDEP are unsure of what is causing the toxicity problems: "[t]he change in well water, and then the chemicals required for additional food safety requirements…might be a part of the…problem. [Pilgrim's] believes toxicity may be traced to additional antimicrobial interventions in more locations throughout the process…" ECF 19-3, p. 6, ¶ 6(e).

Third, although Pilgrim's has claimed that a failed flow meter was thought to be the source of CBOD violations and was replaced, the 2017 Order states that "an additional [C]BOD exceedance has occurred since that time." *Id.*, p. 5, ¶ 6(b). The 2017 Order does not specify the cause of that additional violation (there is no mention of the "duckweed infestation" Pilgrim's has blamed for that violation). *Id.*

Fourth, although the 2017 Order states that conductivity readings were "back in compliance" in January 2017 after a well was taken out of service, it also stated, "it is unclear how production requirements [at the Plant] will be met without additional [well] capacity (*id.*, p. 6, ¶ 6(d)), which indicates the well needs to be brought back on line or new wells with uncertain conductivity levels will need to be activated.

Fifth, the 2017 Order allows Pilgrim's to continue violating, which obviously would not be necessary if Pilgrim's was already fully complying. The order provides that FDEP will not enforce the Plant's permit limits until November 7, 2019 (*id.*, p. 14, ¶ 10), a year and a half later than proposed in the Draft Order (ECF 13-2, p. 7, ¶ 10).[2]

Moreover, the 2017 Order will not lead to timely compliance. It is only the latest in a long line of ineffective administrative orders. Over the past seven years, Pilgrim's has been the subject of four FDEP enforcement orders addressing violations of the same parameters at issue in this case: the 2010 Order (attached as Exhibit 1 to the accompanying Second Declaration of Heather A. Govern); the 2015 and 2017 orders; and Consent Order 10-3539, issued in 2011 (Second Govern Dec. Ex. 2, "2011 Order"). Throughout that time, the Plant repeatedly violated permit limits designed to protect the Suwannee River. FDEP admits, for example, that the Plant failed to reach "full compliance for chronic toxicity by December 31, 2016" despite being required to do so by the 2015 Order. ECF 19-3, p. 3, ¶ 4. Additionally, FDEP found that these violations were causing harm.[3]

The 2017 Order sets "interim limits" that are either well above the actual permit limits or that only require Pilgrim's to report their sampling results (and not meet any limit). This FDEP approach has proven unsuccessful at bringing the Plant into compliance. The 2010 and 2015 Orders set a "report only" interim limit for toxicity, and the 2010 and 2011 Orders set "report only" limits for specific conductance and CBOD, respectively. The effect of the issuance of these orders has been: 33 exceedances of toxicity, 21 exceedances of specific conductance, and

---

[2] As discussed below, the 2017 Order did not amend the Permit limits.

[3] *See* 2015 and 2017 Orders: "The Department finds that the discharges as depicted above [in Tables I through 8] are violations of …Section 403.161(1), Fla. Stat., which states that it is a violation to cause pollution so as to harm or injure human health or welfare, animal, plant, aquatic life or property." ECF 19-3, p. 6 ¶ 5(b); ECF 6-11, p. 4 ¶ 4(b).

3

32 exceedances of CBOD. *See* Second Govern Dec. Ex. 3 ("2010-2011 DMRs"); ECF 6-5; ECF 13-3. Pilgrim's most recent (post-complaint) violation of the permit's chronic toxicity limit occurred in May 2017. *See* Second Govern Dec. Ex. 4 ("May 2017 DMR").

Similarly, the 2017 Order requires Pilgrim's to conduct studies and propose solutions, with an eventual compliance date – just as the unsuccessful 2015 Order (for toxicity), 2011 Order (for CBOD), and 2010 Order (for toxicity and specific conductance) did. While some studies were completed, no follow-up action was taken and compliance was not achieved.[4]

## II. THE "INTERIM LIMITS" IN THE AGREED ORDERS DO NOT SUSPEND THE APPLICABILITY OF PILGRIM'S PERMIT LIMITS.

Pilgrim's suggests that many of the exceedances of its chronic toxicity limits, and one of its specific conductance violations, are not actually violations because its various consent orders contain "interim limits" for these parameters that the Plant did not violate. ECF 19, pp. 3 (asserting the 2010 Order provided an "alternative or interim limit" for specific conductance) & 4 (asserting the "alternative report only limit for chronic toxicity" in the 2010, 2015, and 2017 orders "suspend[s] the applicability of the original permit limit"). This is not the case.

It is clear from the language of the consent orders that FDEP did not intend the interim limits to suspend the applicability of the permit limits. The 2011, 2015 and 2017 orders state:

> These monitoring requirements do not act as State of Florida DEP Wastewater Permit effluent limitations, nor do they authorize or otherwise justify violation of the Florida Air and Water Pollution Control Act, Part 1, Chapter 403, F.S. [which requires compliance with permit limits], during the pendency of this Order.

---

[4] The 2017 Order states that a CBOD compliance plan was submitted by Pilgrim's and accepted by FDEP in March of 2011 but "[n]o documents were submitted to show the activities and test results completed by the plan." ECF 19-3, p. 11 ¶ 8(b). FDEP is now asking that a portion of that plan related to the denitrification filter be completed. *Id*. Another study that did not lead to compliance was the "Toxicity Plan of Study (POS)" required by the 2015 Order. In the 2017 Order, FDEP states that the POS was submitted and approved by FDEP in April of 2014, but that "the Plant has been unsuccessful in consistently passing the chronic [toxicity] requirements under [the 2015 Order]." ECF 19-3, ¶ 8(d). The Plant's most recent toxicity violations occurred in January and May 2017. The 2017 Order now asks that Pilgrim's revise and resubmit the POS, and repeats identical language from the 2015 Order as to what information should be included in the plan.

4

(Second Govern Dec. Ex. 2, ¶ 9(b); ECF 19-3, ¶ 8(h); ECF 6-11, ¶ 6(c)). The 2010 Order states: "[t]his Order does not operate as a permit under Section 403.88 of the Florida Statutes" (Second Govern Dec. Ex. 1, § II(13)). This explains why, in the 2015 Order, FDEP found that toxicity discharge violations occurred in 2013 and 2014 despite the "interim limits" in the 2010 Order. ECF 6-11, ¶ 4(a).[5]

And as a matter of law, the administrative orders could not modify Pilgrim's NPDES permit. A NPDES permit cannot be modified unless the permitting authority follows specific rules governing permit modifications. *Citizens for a Better Environment–Cal. v. Union Oil Co. of Cal. ("UNOCAL")*, 83 F.3d 1111, 1120 (9th Cir. 1996) (state agency consent order with relaxed interim limits did not suspend permit limits where agency failed to comply with "federal and state regulations govern[ing] the modification of NPDES permits"); *Congaree Riverkeeper, Inc. v. Carolina Water Service, Inc.,* 3:15-cv-00194-MBS, 2017 WL 1176766, *11 (D.S.C. March 30, 2017) (same, and *see* cases cited therein); *United States v. Gulf States Steel, Inc.*, 54 F. Supp. 2d 1233, 1245 (N.D. Ala. 1999) ("formal modifications" of a NPDES permit are required); *Culbertson v. Coats American, Inc.*, 913 F. Supp. 1572, 1580 (N.D.Ga.1995).

Courts have held that administrative enforcement orders do not amend or suspend permit limits. *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.,* 399 F. Supp. 2d 726, 734 (E.D. La. 2005) (administrative order "does not revise defendant's permit and simply reflects the [state agency's] current enforcement intentions"); *see also Frilling v. Vill. of Anna*, 924 F. Supp. 821, 844 (S.D. Ohio 1996) (judicially approved consent order did not suspend the legal effect of NPDES permit limitations). More specifically, courts have held that compliance

---

[5] The Amended Complaint contains detailed allegations explaining why the 2010 and 2015 orders do not supersede the permit limits. ECF 6, ¶¶ 138-46, 149-66.

5

deadlines in administrative enforcement orders do not alter or suspend permit requirements. *UNOCAL*, 839 F.2d at 1119; *Friends of Mariposa Creek v. Mariposa Pub. Utils. Dist.*, No. 1:15-cv-00583, 2016 WL 1587228, at *10-11 (E.D. Cal. Apr. 19, 2016); *Culbertson*, 913 F. Supp. at 1579. Similarly, courts have held that "interim limits" in administrative enforcement actions do not modify a NPDES permit. *Friends of Mariposa*, 2016 WL 1587228 at 10.

Permit modification procedures are set forth in 40 C.F.R. §§ 122.62 & 124.5 and Fla. Admin. Code r. 62-620.325(1)(a) ("Revisions to Permit Conditions"). In Florida, a permittee must file an application to revise a permit in accordance with 62-620, F.A.C. and pay a processing fee. Fla. Admin. Code r. 62-620.325(1)(e). FDEP may not revise permit conditions (including effluent limits) unless it shows that such revision is for good cause, and it must provide notice that it intends to revise the limit.

Pilgrim's does not claim, nor have Plaintiffs seen evidence, that the procedural requirements for permit modification were met here. Accordingly, Pilgrim's continues to be governed by the limits specified in its NPDES permit. The consent orders are merely "statements by [the agency] as to how it plans to exercise its prosecutorial discretion." *Culbertson*, 913 F. Supp. at 1580.

Plaintiffs also note that FDEP could not modify the permit's numerical limits to "report only" without violating federal and state laws prohibiting the weakening of permitted effluent limits.[6]

---

[6] *See NRDC v. County of Los Angeles*, 840 F.3d 1098, 1105 (9th Cir. 2016) (fn omitted) ("The anti-backsliding provision of the Clean Water Act prohibits permits from being 'renewed, reissued, or modified ... to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit.' 33 U.S.C. § 1342(o)(1); *see also* 40 C.F.R. § 122.44(l) (EPA regulation imposing identical restrictions)"). There are exceptions to this rule, but none is applicable here.

## III. THE CONSENT ORDERS DO NOT PRECLUDE THIS SUIT.

Pilgrim's suggests, without explicitly arguing, that the FDEP consent orders preclude this suit. However, Pilgrim's cites no authority that would support such a result. In fact, in the CWA, Congress greatly limited the ability of state enforcement proceedings to preclude citizen suits. This is consonant with Congress's intent in enacting the citizen suit provision:

> Congress enacted the citizen-suit provisions of … environmental laws because the world is not ideal, because government agencies face many demands on their resources, because administrations and policy priorities change, and because regulatory agencies are subject to the phenomenon known as 'agency capture.'

*Adkins v. VIM Recycling, Inc.,* 644 F.3d 483, 499 (7th Cir. 2011). The express language of the CWA makes clear that the consent orders *do not* preclude this case.

A state agency can preclude a citizen suit by filing a *judicial* action before the citizens' required 60-day pre-suit notice period expires. 33 U.S.C. § 1365(b). The State of Florida has not filed a judicial action against Pilgrim's, so this provision is inapplicable.

A state agency can also preclude a citizen suit for penalties (but not for injunctive relief) with an *administrative* penalty action, but only in limited circumstances.[7] One limit is that the state administrative law under which the action is taken must be "comparable" to CWA § 309(g), 33 U.S.C. § 1319(g), the federal law under which U.S. EPA conducts its administrative penalty actions. 33 U.S.C. § 1319(g)(6)(A)(ii) & (iii). The Eleventh Circuit has held that the penalty assessment, public participation, and judicial review provisions of a state administrative law must be "roughly comparable" to the corresponding provisions of § 309(g). *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1255-1256 (11th Cir. 2003) (holding Alabama administrative law not comparable to § 309(g)); *see also id.* at 1255 (rejecting the "loose" approach to comparability adopted by the First and Eighth Circuits). The analysis of comparability focuses on the statutes

---

[7] The 2010 Order did not impose a penalty so it does not preclude the violations that are the subject of the 2010 Order.

7

themselves, not the factual circumstances of any particular case. *Kendall v. Thaxton Rd. LLC*, No. 1:09-CV-3520, 2013 WL 210892, at *4 (N.D. Ga. January 18, 2013) (that plaintiff's public participation in administrative proceeding would have satisfied federal requirements was irrelevant, since "the Georgia and federal statutory schemes have different public participation provisions").

Here, Florida law is not comparable to § 309(g) for at least two reasons. First, the amount of penalties that can be obtained are wildly different. EPA is authorized to assess up to $125,000 in an administrative proceeding. 33 U.S.C. § 1319(g)(2). Florida is authorized to assess only up to $10,000 in an administrative proceeding. Fla. Stat. § 403.121(2)(b). Second, the public participation provisions are not comparable. The federal scheme gives the public the formal right to participate in the penalty assessment process *before* the penalty order is finalized. 33 U.S.C. § 1319(g)(4)(A). The Florida scheme does not. Fla. Stat. § 403.121(2). *See McAbee*, 318 F.3d at 1256-1257 (in holding that Alabama's administrative penalty law was not "comparable," noting that "[i]n pre-order proceedings, an agency has not hardened its position, and interested persons are not subject to the same technical pleading requirements or burdens of proof that are imposed once the state has issued an order").[8]

Another limit on the preclusive effect of state administrative actions is that the action must be "commenced" *before* the citizens provided the requisite pre-suit notice. 33 U.S.C. § 1319(g)(6)(B)(i). In Florida, an administrative penalty proceeding is commenced by FDEP serving a written notice of violation upon the violator by certified mail. Fla. Stat. § 403.121(2)(c). Plaintiffs have found no evidence, and Pilgrim's has not claimed, that an FDEP

---

[8] In addition, Florida law prohibits more than one administrative action against a violating facility at a time, which significantly curbs the ability of the state to obtain penalties against violators. Fla. Stat. § 403.121(2)(b). The federal statute does not contain a similar constraint on the ability to bring administrative penalty actions. 33 U.S.C. § 1319(g).

8

notice of violation has been served for the violations at issue here. In the absence of such a notice, the Eleventh Circuit has held that an administrative penalty action is deemed "commenced" for purposes of § 309 when it is issued as a final consent order. *McAbee*, 318 F.3d at 1251. Because the 2017 Order was not issued until June 2017, after Plaintiffs' notice letters were served in December 2016 and January 2017, it has no preclusive effect on Plaintiffs' case.[9]

## IV. *ST. JOHNS RIVERKEEPER* AND *APALACHICOLA BAY* ARE ON POINT.

Although it attempts to distinguish two cases cited by Plaintiffs – *St. Johns Riverkeeper, Inc. v. Jacksonville Elec. Auth.,* Nos. 3:07-cv-739 & 3:07-cv-747, 2010 WL 745494 (M.D. Fla. March 1, 2010) and *Apalachicola Bay and River Keeper, Inc. v. Gulf Power Co.,* No. 4:14-cv-268, 2014 WL 11512203 (N.D. Fla. September 26, 2014) – Pilgrim's does not dispute the legal principles underlying those decisions. ECF 19, pp. 4-5; ECF 13, pp. 1, 4-7, 6-9, 12-13. Both cases hold that even significant measures to reduce violations are not sufficient to oust a court's jurisdiction over a citizen enforcement suit unless the defendant demonstrates that those measures will ensure that no further violations will occur. *St. Johns Riverkeeper*, 2010 WL 745494, at *7; *Apalachicola Bay*, 2014 WL 11512203, at * 7.

In any event, Pilgrim's attempt to distinguish these cases is unavailing. The fact that the *Apalachicola Bay* plaintiffs ultimately decided to forgo their claim for copper violations has no bearing on the court's conclusion that the allegation of ongoing copper violations had been made in good faith. Similarly, the larger size and number of violations of the wastewater treatment

---

[9] Citizens are also precluded from seeking penalties for violations for which the violator has already paid an administrative penalty, but only if the state administrative scheme is comparable to § 309(g) (which in Florida is not the case, as discussed above), and only if the penalty was paid before the citizen's complaint is filed (not the case with respect to the 2017 Order). 33 U.S.C. § 1319(g)(6)(A)(iii) & (B)(i). Pilgrim's did not meet the 2015 Order's penalty payment deadline of December 31, 2016. See ECF 6, ¶¶ 170-172.

9

plant at issue in *St. Johns* has no bearing on the applicability of the legal principles in that case.[10]

Dated: July 11, 2017

/s/ Andrew Bonderud
Andrew M. Bonderud, (fl-102178)
The Bonderud Law Firm, P.A.
301 W Bay St #1433
Jacksonville, FL 32202
904-438-8082
Email: bonderudlaw@gmail.com

/s/ David A. Nicholas
David A. Nicholas
*Admitted pro hac vice*
20 Whitney Road
Newton, Massachusetts 02460
(617) 964-1548
Email: dnicholas@verizon.net

/s/ Heather A. Govern
Heather A. Govern
Joshua R. Kratka
*Admitted pro hac vice*
National Environmental Law Center
294 Washington Street, Suite 500
Boston, MA 02108
(617) 747-4301
Email: govern.nelc@gmail.com
Email: josh.kratka@nelconline.org

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2017, I electronically filed the foregoing document with the Clerk of Court via the CM/ECF system, which will send a notice of electronic filing to all registered counsel for Defendant.

/s/ *Heather A. Govern*
Heather A. Govern

---

[10] Although Pilgrim's cites to Footnote 1 of *St. Johns* as a justification for not having discussed the case in its motion, ECF 19, p. 5 n.5, opinions that include that exact footnote are often cited by the same district court, by other district courts, and by appellate courts. *See, e.g., Trent v. Mortgage Electronic Registration Systems, Inc.,* 618 F. Supp. 2d 1356 (M.D. Fla. 2007) (cited in 91 cases).